# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 2, 2018          Decided May 25, 2018

No. 12-3036

UNITED STATES OF AMERICA,
APPELLEE

v.

AUMBREY WINSTEAD, ALSO KNOWN AS ANDRE WINSTEAD,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cr-00242-1)

*Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender. Tony Axam Jr., Assistant Federal Public Defender, entered an appearance.*

*David P. Saybolt, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Jessie K. Liu, U.S. Attorney, and Elizabeth Trosman, Assistant U.S. Attorney.*

Before: GARLAND, *Chief Judge,* and EDWARDS and SILBERMAN, *Senior Circuit Judges.*

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge:* This is a quite unusual criminal case. Appellant Aumbrey Winstead challenges his conviction for possession of a firearm (by a person convicted of a crime punishable by imprisonment of more than one year), possession with intent to distribute cocaine, and possession of a firearm during a drug trafficking offense. His primary evidentiary claim relates to the admission of evidence of prior crimes, which he asserts were stale. Although we think he has a point, it doesn't matter because the evidence of guilt was overwhelming. However, he also asserts that he received ineffective assistance of counsel, both at trial and at sentencing. Per our normal practice, we remand to the district judge the issue of ineffective assistance at trial, but we conclude – as a matter of law – that Appellant received ineffective assistance at sentencing, and that his sentence as a career criminal was improper. We therefore remand for new sentencing.

## I. THE TRIAL

### A.

The catalyst for the events leading to Winstead's arrest was a car accident. On May 15, 2011, Shervonne Murphy stopped her car at a red light as she returned home from church with her daughter and her boyfriend. Winstead was riding in another vehicle – driven by a man named George – when it plowed into Murphy's car while she was stopped at the intersection. George quickly offered Murphy $20,000 and attempted to prevent her from calling the police, but she called 9-1-1. Fearing for her safety after observing what she believed to be a gun under Winstead's shirt, and judging from his behavior that he was

3

"totally wasted," she called 9-1-1 a second time and asked the police to hurry. Before the police arrived, Murphy and her boyfriend saw Winstead walk across the street and up a hill into the woods, where he briefly disappeared from their sight. When he returned shortly thereafter, the bulge under his shirt was gone.

When the police arrived and decided that Winstead and George were "acting very squirrelly," the two were handcuffed and seated next to each other on the curb. One officer conducted a protective pat-down to search for weapons, and testified that he felt a bulge and a wad of money in Winstead's cargo pocket, but he didn't remove them. He noticed Winstead nudge George with his leg and then nod to the wooded area where he had previously disappeared. Suspicious of the situation, the officer hid behind a nearby telephone box and waited for his fellow officers and the two cars from the accident to clear the scene. Sure enough, soon after the other policemen left, George's car returned, and the officer observed Winstead jogging back toward the wooded area. The officer followed him and hid in "a shadowy spot," where he watched Winstead pace back and forth "a couple of times as if he were looking for something" and then proceed to bend over and "pick[] up a shiny object," which the officer believed to be a handgun. Winstead then received a call on his cell phone and immediately dropped the shiny object, lit a cigarette, and began to walk out of the woods.

At this point, the hidden officer called for support from his two colleagues, who returned in their squad cars and arrested Winstead. He then walked from his hiding place to the location where he had observed Winstead pick up and drop the shiny object, and found two firearms. When Winstead was searched incident to his arrest, police found money and 25 ziplock bags

of cocaine packaged inside a larger ziplock bag marked with an apple emblem within his cargo pocket.

Winstead was taken to jail. During his stay, several recorded phone calls were logged under his unique telephone identification number. The caller – who identified himself as "Brey" and whose voice was identified as Winstead's by a witness when the recording was played at trial – placed one call to a woman Winstead had been seeing, Ms. Genai Johnson. He complained that George should not claim that the caller owed him anything: "You shouldn't have crashed the m—f—in' car while we got s— in the car, man. I hid the m—f—in' hammers for you, n—."[1]

Winstead chose to testify. He asserted that he went into the woods after the car accident in order to relieve himself, and that as he walked back to the car, George "grabbed something out of the back of the trunk that was wrapped up, and then George went into the woods." Winstead claimed that after departing the scene following the initial police interaction, he realized that he had forgotten his cell phone, and returned to the area where he had relieved himself to retrieve it. Winstead testified that no drugs were found on his person during the search incident to his arrest. When the recording of the discussion of hiding the "hammers" was re-played during Winstead's cross examination, he denied that the caller's voice was his.

---

[1] A government witness testified that the term "hammers" is commonly used as slang for guns. One of the two guns found by the officers was a large black 9mm firearm with an extended magazine; the other was a "shiny small" .22 caliber handgun.

Winstead also testified that he commonly stayed at Ms. Johnson's apartment, located at 1333 Savannah Street in Southeast Washington. As it happened, the police executed a search warrant at that apartment four days prior to the car accident. Although Winstead had denied that it had been Ms. Johnson's voice on the prison phone call, he admitted that he was present in her apartment during the search and that he recognized some of the items found there. He denied ownership, however, of other items the police found in the apartment: a 9mm pistol, two ounces of PCP, vials used for PCP distribution, and small ziplock bags and apple bags similar to those allegedly found in his pocket on the night of the car accident. When another jail phone call was played, which he admitted was his voice, he was heard lamenting that "they ran into Shorty's house and took all of my s—." He denied, however, that Ms. Johnson was the "Shorty" in question, noting that he had "other female friends," but declining to say who was on the phone. Nor did Winstead explain which seizure his statement referred to, if not the Savannah Street search.

The prosecution introduced evidence of Winstead's prior crimes for impeachment and to prove knowledge and intent with respect to his charges. He admitted to three previous convictions. In 1998, he was convicted of *attempted* possession with intent to distribute 23 ziplock bags of cocaine. In 2002, he sold marijuana in a ziplock bag to an undercover officer, resulting in a conviction for *attempted* distribution. And in 2004, he was caught with a 9mm pistol during a traffic stop and was convicted of unlawful possession of a firearm by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year, or "felon in possession." Besides Winstead's admissions, the prosecution offered the testimony of the policeman who discovered the pistol, as well as court documents from the three cases.

The jury found Winstead guilty of three crimes: unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year,[2] possession with intent to distribute cocaine,[3] and possession of a firearm during a drug trafficking offense.[4]

## B.

Appellant's primary complaint concerning the judge's trial rulings focused on the admission of his prior crimes. Particularly in light of our deferential standard of review of a district judge's decision to admit such evidence under Federal Rules 403 and 404(b) (abuse of discretion), two of his claims are insubstantial. Winstead complains that the district judge – who did give a limiting instruction to the jury with respect to the prior crimes evidence – should have given it more than once. But we have never so held.[5] *See United States v. McCarson*, 527 F.3d 170, 174 (D.C. Cir. 2008). He also contends his prior gun conviction was irrelevant to his drug crime. But the government's drug expert testified that the distribution of drugs is a risky business – there are groups in the city who prey upon and rob drug dealers. Drug dealers thus typically carry pistols such as Winstead was convicted of possessing in 2004. In other

---

[2] 18 U.S.C. § 922(g)(1).

[3] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

[4] 18 U.S.C. § 924(c)(1).

[5] Indeed, Winstead did not even request additional instructions when the evidence was admitted. *See United States v. Miller*, 895 F.2d 1431, 1439 (D.C. Cir. 1990) (citing *United States v. Lewis*, 693 F.2d 189, 196 (D.C. Cir. 1982)).

words, a pistol is a tool of the trade, and its possession is therefore probative of knowledge and intent. *See United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002).

More troubling, however, is Appellant's contention that under our precedent, his past crimes are stale and, therefore, no longer relevant. In that regard, we recently held that a ten-year-old PCP conviction was too old to be used to establish knowledge for a similar crime. *United States v. Sheffield*, 832 F.3d 296, 307-08 (D.C. Cir. 2016). The government would distinguish *Sheffield*. It first points out that in *Sheffield* only the fact of the prior crime was introduced, reducing its probative value relative to its prejudicial effect. In this case, however, the government introduced extensive evidence drawing a parallel with Winstead's later behavior. The 1998 conviction involved ziplock bags of cocaine, which Winstead had confessed he intended to distribute, and the pistol used in 2002 was of the same caliber – 9 mm – as the larger firearm used in the instant case. We suppose there may be something to this distinction, but we are not sure which way it cuts. It is not clear to us that the greater detail does not come with greater prejudice as well.

The government's primary ground offered to distinguish *Sheffield* – drawing upon a notion several courts have accepted, *see United States v. Cherry*, 433 F.3d 698, 702 & n.4 (10th Cir. 2005); *United States v. Brooks*, 736 F.3d 921, 940 (10th Cir. 2013); *United States v. Sterling*, 738 F.3d 228, 238-39 (11th Cir. 2013); *United States v. Halk*, 634 F.3d 482, 487-88 (8th Cir. 2011) – is that the staleness of old crimes is lessened if part of the time between the defendant's old crime and a new case was spent in prison. Although our sister circuits do not explain their reasoning, we think that they are assuming that conversations in prison would refresh a prisoner's knowledge of the modus

operandi of drug crimes.[6] We are not sure that is a legitimate assumption in every case.

Be that as it may, we have no need to decide this question today. Regardless of whether the prior convictions were too stale for admission – such that their probative value was substantially outweighed by their prejudicial effect under Rule 403 – overwhelming evidence of Winstead's guilt was presented in this case. Jurors heard testimony from two civilian witnesses who observed a bulge under Winstead's clothes that was gone when he returned from the woods. They heard testimony from a policeman who followed Winstead when he went back into the woods to retrieve the guns, and found them there. They heard testimony from other officers who found the baggies on his person after arresting him, and saw the test results confirming that the baggies contained cocaine. They heard the recordings of Winstead's jail phone calls in which he admitted that he hid the "hammers" for George and discussed the Savannah Street search. They examined properly admitted evidence from that search, including a firearm, clothing that he admitted to recognizing, suspected PCP, and plastic packaging baggies that were almost identical to the ones found on his person only four

---

[6] If past crimes could be shown to demonstrate a propensity to commit the same crime, it could be argued that a long stretch in prison is not commensurable with a period of criminal inactivity in society, because the individual lacked the opportunity to recidivate while in prison. But this is, of course, precisely the type of inquiry that Rule 404(b) forecloses. Nevertheless, some courts appear to hint at this alternative logic. *See United States v. Cherry*, 433 F.3d 698, 702 n.4 (10th Cir. 2005).

days later.[7]  And when Winstead chose to take the stand, the jurors heard him use his voice to deny, under oath, that the recording of his voice actually contained his voice.  We therefore hold that any error – if it was – in admitting the prior crimes evidence was harmless.  *See Sheffield*, 832 F.3d at 309.

## II.  THE SENTENCE

### A.

The government requested a sentence of 360 months, the bottom end of what it described as the applicable guideline range of 360 months to life imprisonment.  This was calculated pursuant to United States Sentencing Guideline § 4B1.1(c), and – most important – was based on a determination that Winstead's past convictions render him a career offender under § 4B1.1(a).  As a career offender convicted of 18 U.S.C. § 924(c), his guideline range must be calculated using the Career Offender Table in § 4B1.1(c)(3).[8]

---

[7] Winstead also argues that the admission of the Savannah Street evidence – which he claims occurred only as a result of ineffective assistance of counsel – was prejudicial.  We address the ineffective assistance of counsel claims below, but we note here that even without the Savannah Street evidence, we would find any error with respect to the previous three convictions harmless in light of the significant evidence against him.

[8] Because Winstead was convicted of other crimes in addition to the § 924(c) offense, § 4B1.1(c)(2) dictates a guideline range calculated as "the greater of" two alternatives: either adding together the separate sentences for his offenses, or utilizing the Career Offender Table in § 4B1.1(c)(3).  In Winstead's case, the latter – assigning a range of 360 months to life – was greater.

It's not as if the prior convictions were Appellant's only blemishes. The government noted in its sentencing memorandum that Winstead, within one year of his release from serving time for his third prior conviction, was arrested for distributing marijuana on September 14, 2010. The government, however, declined prosecution. Two weeks later, on September 28, 2010, he was arrested for felony possession of a vial of PCP. However, the charges were dismissed because a chemist at the Drug Enforcement Agency failed to follow the appropriate chain-of-custody procedures. And before that case had even been dismissed, Winstead was arrested in December of 2011 for distribution of heroin, but prosecutors did not bring a case.[9] Finally, the government noted that a judge found probable cause for the Savannah Street search warrant based on evidence implicating Winstead as a suspect in the March 2011 murder of a prostitute in Southeast Washington, approximately two months before the car accident in this case.

Still, whatever his history, once Appellant was adjudged a career criminal, the guideline range for his sentence jumped from 211-248 months to 360 months-life. In other words, that designation added approximately 10 years to Appellant's sentence. Accordingly, the district judge, describing Winstead as a career offender, sentenced him to 360 months.

---

[9] The government explained that "[a]n undercover officer observed [Winstead] engage in a hand-to-hand transaction with a second individual in which [Winstead] exchanged a small object for currency. The police stopped the second individual, who was holding a ziplock of heroin, and then stopped [Winstead]." However, because the police found only cash on Winstead's person, but no additional heroin, the United States Attorney's Office did not prosecute him.

Unfortunately, Winstead's counsel did not put up much opposition at the sentencing hearing.  While he did object that the guideline was "excessive" given the small quantity of drugs involved and the fact that Winstead did not brandish the guns in question or engage in violence, counsel's primary objection was that the statutory enhancement under 21 U.S.C. § 851 might not apply, given that only 2.5 grams of drugs were involved.  This argument was irrelevant, however, because Winstead's range was ultimately based on the Career Offender Table in § 4B1.1(c)(3) rather than on the statutory enhancement that counsel cited.  *See* USSG § 4B1.1(c)(2).

Following this brief attempt to mitigate the sentence, Winstead's counsel proceeded to address the court with "cand[or]":

> I could not find a factual basis to argue with any hope of persuasion to a court that a variance from the guideline range was appropriate.  I couldn't find it, Your Honor, not in these facts, not in my client's background.  It's not there.  I was not going to ask for it.  My client is resigned to his fate. . . .  I can only be candid with this court.  I know this court's feeling about certain types of behavior very well. . . .

> I think the bottom of the calculated guideline range, Your Honor, as the government indicates, is a homicide sentence, is 30 years.  It's a first-degree murder sentence. . . . I wish I had a basis to argue to the Court there was something in my client's history to suggest that something less than 30 years would constitute – bottom of the guidelines would constitute just punishment.

My hands are tied, Your Honor. I cannot. I've explained that to my client, and he fully expects at least a 30-year sentence to be imposed by this court. He expects that.

B.

The most powerful argument challenging Appellant's sentence is the textual one: that attempted drug offenses, which caused his career criminal status, are not included in the guidelines. Instead, attempts are only added in the commentary to the guidelines. But – and it is a big "but" – this issue was not raised below. Therefore, our normal standard of review is plain error. And that standard can not possibly be met since this very issue has been decided *against* Appellant in several other circuits. *United States v. (Norman) Williams*, 350 F.3d 128, 130 (D.C. Cir. 2003). There remains, however, the question how this textual issue appears to us in the context of Appellant's final argument – that he was disadvantaged because of ineffective assistance of counsel.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

#### A. Pre-Trial and Trial

Appellant raises a number of arguments supporting his claim that his counsel's representation before and during trial was inadequate. The government's response is that the case against Winstead was overwhelming and, therefore, he was not prejudiced.

Ironically, the very strength of the government's case makes the decision to go to trial rather than accept a plea rather

puzzling.[10]  Appellant claims that he was not effectively represented in plea negotiations.  The record is quite sketchy regarding plea discussions, so in accordance with our normal practice when we cannot definitely reject an ineffective assistance of counsel claim, *United States v. Rashad*, 331 F.3d 908, 912 (D.C. Cir. 2003), we will remand the trial issues to the district judge.

## B.  Sentencing

Appellant makes a number of arguments concerning his counsel's mistakes at sentencing, including his failure to ask for a downward variance (we certainly have the impression from the dialogue that we set forth above that counsel didn't have his heart in a claim for more lenient treatment).  But by far the most damaging error the counsel made, according to Appellant, was not to raise the textual argument referred to above: that his previous crimes which were counted to make him a career criminal – "attempted" distribution of, and "attempted" possession with intent to distribute, drugs – are listed in the commentary to the guidelines but *not* in the guidelines themselves.  Although, as we noted, at least five circuits have held the commentary a legitimate interpretation of the guidelines, we had not decided the issue, and the 8th Circuit en banc opinion was accompanied by a strong dissent.[11]  *United*

_____

[10] Even with no plea offer, acceptance of responsibility alone would have reduced Appellant's sentence significantly.

[11] While *Mendoza-Figueroa* focused on the underlying statutory dispute that we addressed in *United States v. Price*, 990 F.2d 1367 (D.C. Cir. 1993), *see infra* note 13, the dissent stressed that "Note 1 could not support the defendant's sentence as a career offender" because it was not supported by the statutory text in which it was

*States v. Mendoza-Figueroa*, 65 F.3d 691, 694-98 (8th Cir. 1995) (en banc) (Gibson, J., dissenting).

Therefore, in the absence of an objection, Winstead's 30-year sentence was calculated pursuant to United States Sentencing Guideline § 4B1.1(c), based on a determination that he is a career offender under § 4B1.1(a). That guideline confers career offender status on persons with two prior felony convictions of "either a crime of violence or a controlled substance offense." USSG § 4B1.1(a)(3). In Winstead's case, the district judge determined that his two previous drug crimes were controlled substance offenses (the gun possession does not qualify as a crime of violence).

According to the commentary to that guideline, the term "controlled substance offense" is "defined in § 4B1.2." USSG § 4B1.1, Application Note 1. And that guideline – which, Winstead points out, is titled "*Definitions* of Terms used in Section 4B1.1" – states as follows:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

USSG § 4B1.2(b) (emphasis added).

---

grounded.  65 F.3d at 697.

As is apparent, neither the crime of attempting to distribute drugs nor attempted possession with intent to distribute drugs is included in the guideline list. The commentary to § 4B1.2, however, states that "'controlled substance offense' include[s] the offenses of aiding and abetting, conspiring, and *attempting* to commit such offenses." *Id.*, Application Note 1 (emphasis added). Winstead argues that this commentary cannot be squared with the guideline – and that neither of his two previous drug crimes falls within the definition of "controlled substance offense," because each conviction was for mere *attempt*.

Bearing in mind the enormous difference in Appellant's potential term of imprisonment if sentenced as a career criminal (over ten years), it is hard to see how this issue should not have appeared as a crucial one to effective counsel. After all, the merits case against his client was formidable. But to make out a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), an appellant must show both that the errors were serious – which should be obvious in this case – and that there is, at least, a reasonable probability that the result of the proceeding would have been different. *Id.* at 687; *see also U.S. v. Abney*, 812 F.3d 1079, 1086-95 (D.C. Cir. 2016).

We recognize that the Guidelines are only discretionary. However, the Supreme Court "has made clear that the Guidelines are to be the sentencing court's 'starting point and . . . initial benchmark.'" *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1345 (2016) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). "The Guidelines inform and instruct the district court's determination of an appropriate sentence. In the usual case, then, the systemic function of the selected Guidelines range will affect the sentence." *Id.* at 1346.

As we noted, counsel's failure to raise this obvious legal argument below means our standard of review is plain error, and we would not reverse the district court's decision on the guidelines issue under that standard. But since we think it was a mistake for counsel not to raise this issue – a serious mistake – under *Strickland* we must further ask whether raising the argument below would have changed the result. And that necessarily leads us to ask whether it was a winning argument, which, of course, goes to the merits of the issue.

To be sure, we would normally remand serious claims of ineffective assistance to the district judge to determine whether effective counsel could have changed the result, as we are doing with the pre-trial and trial issues. But this is an unusual case. The textual issue is a purely legal question. And, as we have explained, it was an obvious legal argument to make (at the least, to preserve for appeal). If accepted, it would make an enormous difference to Appellant's sentence. And there was no conceivable tactical reason (which we would generally be reluctant to second-guess) for not making it. Indeed, in light of the overwhelming evidence of guilt, it was the only serious argument the defendant had in the entire case. There thus would have been no reason to prioritize some other argument and, in fact, defense counsel made no other serious argument.

We therefore pass on to consider the merits of Appellant's claim not by the deferential plain error standard that would ordinarily govern an issue not raised below, but rather *de novo*. In other words, in order to determine whether counsel's failure to raise the textual issue was ineffective assistance of counsel – since the textual issue itself is a pure question of law – we must treat the issue as if it had been raised below.

17

\* \* \*

Turning to the merits, there is no question that as Appellant points out, the commentary adds a crime, "attempted distribution," that is not included in the guideline. To be sure, the Supreme Court in *Stinson v. United States*, 508 U.S. 36 (1993) held that the commentary should "be treated as an agency's interpretation of its own legislative rule." 508 U.S. at 44-45 (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Thus, under this *Seminole Rock* deference, "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38. If the two are inconsistent, "the Sentencing Reform Act itself commands compliance with the guideline." *Id.* at 43 (citing 18 U.S.C. § 3553(a)(4), (b)).

Appellant argues that they are indeed inconsistent. By purporting to add attempted offenses to the clear textual definition – rather than interpret or explain the ones already there – he contends that the commentary in Application Note 1 exceeds its authority under *Stinson*. For support, he points to our decision in *United States v. Price*, 990 F.2d 1367 (D.C. Cir. 1993), which reversed a career offender sentence in similar circumstances because the commentary impermissibly purported to expand the scope of a penalty to include conspiracy to violate substantive drug provisions. He also notes that our decision in *United States v. Alexander*, 331 F.3d 116 (D.C. Cir. 2003) – which held that the term "serious drug offense" in the Armed Criminal Career Act includes attempts – relied heavily on the presence of the word "involving" in the statutory definition, which has "expansive connotations," *id.* at 131. Section 4B1.2, by contrast, includes no such broad language. Finally, he calls

our attention to the Supreme Court's decision in *James v. United States*, 550 U.S. 192 (2007), which held that the Armed Criminal Career Act's definition of "violent felony" did not encompass attempted burglary simply by including the completed offense of burglary. According to Winstead, the analogy to *James* is direct: "'Attempted distribution' is not 'distribution' any more than 'attempted burglary' is 'burglary.'" Br. App. 38.

In response, the government leans on the decisions of several of our sister circuits, each of which defer to Application Note 1 when applying § 4B1.2. *See United States v. Lange*, 862 F.3d 1290, 1294 (11th Cir. 2017); *United States v. Nieves-Borrero*, 856 F.3d 5, 9 (1st Cir. 2017); *United States v. Solomon*, 592 F. App'x 359, 361 (6th Cir. 2014); *United States v. Chavez*, 660 F.3d 1215, 1228 (10th Cir. 2011); *United States v. Mendoza-Figueroa*, 65 F.3d 691 (8th Cir. 1995) (en banc).

We agree with Winstead. Section 4B1.2(b) presents a very detailed "definition" of controlled substance offense that clearly excludes inchoate offenses. *Expressio unius est exclusio alterius*. Indeed, that venerable canon applies doubly here: the Commission showed within § 4B1.2 itself that it knows how to include attempted offenses when it intends to do so. *See* USSG § 4B1.2(a)(1) (defining a "crime of violence" as an offense that "has as an element the use, attempted use, or threatened use of physical force . . . .").[12]

---

[12] To be clear, our holding does not invalidate Application Note 1's guidance with respect to whether a "crime of violence" includes the offenses in that Note. We address only the scope of the definition of "controlled substance offense." We also note that given this holding, we have no need to reach Winstead's alternative argument

It might be argued that other federal laws do include "attempted transfer" in defining drug distribution offenses – and that we should read the guidelines *in pari materia* with these other statutes in order to better discern their meaning. *See, e.g.*, 21 U.S.C. § 802(8), (11). However, in *Burgess v. United States*, 553 U.S. 122 (2008), the Supreme Court made clear that "[a]s a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated," *id.* at 130 (citation omitted), and that the statute in that case "defines the precise phrase used" in determining whether to apply a sentencing enhancement. *Id.* at 129. Moreover, we interpret the specific inclusion of attempt offenses elsewhere in federal drug law just as we do the inclusion of attempt in § 4B1.2's definition of "crime of violence": when enumerating a list of specific offenses that qualify to support career offender status, the drafters declined to include attempt despite its presence elsewhere.

In this respect, the government's failure to even address Winstead's textual arguments, and its near-exclusive reliance on cases from outside this circuit which generally do the same, is reminiscent of *United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013), *cited with approval in Dahda v. United States*, 584 U.S. ___ (2018). There, we found plain error where sister circuit decisions ran "contrary to the plain text of the statute," *id.* at 513, and considered "the government's reluctance to come to grips with the language . . . quite revealing." *Id.* at 516. So, too, here.

---

that the D.C. statute under which he was convicted for attempted distribution of marijuana fails categorical analysis under *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013). Nor need we reach Winstead's other claims demanding resentencing.

This is all the more troubling given that the Sentencing Commission wields the authority to dispense "significant, legally binding prescriptions governing application of governmental power against private individuals – indeed, application of the ultimate governmental power, short of capital punishment." *Mistretta v. U.S.*, 488 U.S. 361, 413 (1989) (Scalia, J., dissenting). If the Commission wishes to expand the definition of "controlled substance offenses" to include attempts, it may seek to amend the language of the guidelines by submitting the change for congressional review. *See Stinson*, 508 U.S. at 44. But surely *Seminole Rock* deference does not extend so far as to allow it to invoke its general interpretive authority via commentary – as it did following our decision in *Price*[13] – to impose such a massive impact on a defendant with no grounding in the guidelines themselves.[14] We therefore

---

[13] In *Price*, we rejected the inclusion of conspiracy as a controlled substance offense because the Commission stated in its commentary that it had promulgated §§ 4B1.1 and 4B1.2 based on Congress' command in 28 U.S.C. § 994(h). Since that statute included only substantive offenses, but neither conspiracy nor attempt, we invalidated Application Note 1's inclusion of inchoate offenses as controlled substance offenses. In response to that ruling, the Commission modified its commentary to claim that Application Note 1 was based more broadly upon its understanding of its "general statutory authority." *United States v. Seals*, 130 F.3d 451, 463 (D.C. Cir. 1998).

[14] The dissent in *Mendoza-Figueroa* relied in part on the rule of lenity, which favors a defendant if a criminal statute is ambiguous. We do not think it necessary to rely on it because we do not believe the guidelines are ambiguous. In any event, it is not obvious how the rule of lenity is squared with *Stinson's* description of the commentary's authority to interpret guidelines. We are inclined to

remand the case for resentencing consistent with this opinion and factual resolution of Winstead's trial-related claims of ineffective assistance of counsel.

*So ordered.*

---

believe that the rule of lenity still has some force.