In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2932

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN A. ADAMS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:17-CR-40062 — **James E. Shadid**, *Judge.*

ARGUED MAY 16, 2019 — DECIDED AUGUST 20, 2019

Before BAUER, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Defendant Steven Adams pleaded guilty to being a felon in possession of a firearm. In this appeal, he challenges the district court's denial of his motion to suppress and its application of the Sentencing Guidelines to his case. We affirm. Probable cause supported the search warrant for Adams' house, and in any event the officers could rely on the warrant in good faith. Further, the district court

properly calculated Adams' guideline range, taking into account his prior drug conspiracy conviction.

I.   *Factual & Procedural Background*

On March 22, 2016, Adams, his girlfriend, and a third person were pulled over for speeding. The car was registered to Adams' girlfriend, Leanna Brandon. Law enforcement officers were familiar with Adams because he was the subject of anonymous tips regarding drug activity at his house in Keithsburg, Illinois. They also knew that Adams had a previous conviction for conspiracy to distribute methamphetamine. The third person in the car was also the subject of anonymous tips regarding drug activity and had outstanding arrest warrants.

During the traffic stop, the sheriff's deputy smelled marijuana from the car. The car was searched, and deputies found a meth pipe, paraphernalia used with marijuana, and marijuana. The three occupants were arrested and taken back to the station, where Brandon—after receiving *Miranda* warnings—told the arresting deputy that additional items of drug paraphernalia, a gun, and a safe containing methamphetamine pipes were at Adams' house. Brandon told the deputy that she also stayed in the house and that she had been there earlier that same day. She described the layout of the house and provided descriptions of Adams' bedroom and the gun and paraphernalia.

In his application for a search warrant, the deputy wrote:

> Brandon disclosed that at Adam's residence, at [street address], there is often meth and cannabis used. Brandon stays at the residence, and is familiar with the goings on there. She said that

there is drug paraphernalia for ingestion of cannabis and methamphetamine in the house.

Brandon went into great detail of Adams bedroom where she sleeps when she stays. She said she was last there at around 0430 hours this morning (03/22/2016). She described Adams' room as being in the northwest corner of the house and drew a floor plan of the house. She drew an enlargement of Adams' room. She described a dresser with a mirror on the west wall of the bedroom. She said that on that dresser, there is always a clear glass bong. She has seen it used to ingest cannabis. She said the bowl part of it is not on it, but it does have residue in it. She also said that there is a colorful swirled designed "bowl" that looks like an elephant; this is used for ingestion of cannabis on a nightstand next to the bed. She said that her .45 caliber Smith and Wesson pistol is in the house. It has a cable lock in it and she has the only keys. She said the pistol is black and is in the blue plastic case. She said there is a gray/black colored safe in the bedroom. Inside that safe is meth pipes, and maybe some meth and cannabis.

Brandon said Adams' bedroom is locked with a deadbolt. She said that only she and Adams have keys. She said that only Adams and she have the keys for the safe in the bedroom, and she provided me one from her purse.

She said that there may be other paraphernalia in the house. She said that [Female] and [Male]

stay in a bedroom next to Adams. She said that [Female] frequently "huffs" hair spray and has expressed her displeasure of the aerosol odor in the house to [Female]. This agency has also received recent information about [Male] being at the residence. [Male] had a history for possession of narcotics through Iowa.

Based on the results of the traffic stop search, Adams' prior conviction, the anonymous tips, and the information from Brandon, the police obtained a search warrant for Adams' house from a state-court judge. They executed the warrant the same day as the traffic stop. In Adams' room, they found a locked plastic gun case that Brandon had described. A .45 caliber Smith & Wesson handgun and two loaded magazines were inside the case. Adams later admitted that he had Brandon buy the gun for him because he was a felon.

A federal grand jury charged Adams with unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). Adams moved to suppress the evidence discovered pursuant to the state search warrant, contending that the affidavit in support of the application did not establish probable cause. He also argued that the good-faith exception to the exclusionary rule should not apply because the affidavit was so lacking in probable cause that a reasonable officer could not have relied on the warrant.

The district court ruled from the bench and denied Adams' motion to suppress. The court explained that the issuing judge had a "substantial basis for determining the existence of probable cause" because Brandon had "provided firsthand detail," the information was "fresh" as it "was within a day" since she had been at the house, and the information was "in

some form corroborated by the number of tips." The court noted that the tips were anonymous and that standing alone they would not establish probable cause. But the court explained that the tips provided some corroboration in conjunction with the other information. The court also highlighted the traffic stop of the "vehicle that involved drugs" and noted that, "to some degree," Brandon's statements to the deputy were "against her penal interest." The court concluded: "So, I believe that all of this provides plenty of information for the establishment of probable cause. If it didn't, I do believe there is no question that there is good faith here."

Adams pleaded guilty to the indictment, reserving his right to appeal the denial of his motion to suppress. At sentencing, Adams objected to the probation officer's use of a base offense level of 20 under § 2K2.1(a) of the Sentencing Guidelines, arguing that his Illinois methamphetamine conspiracy conviction should not count as a "controlled substance offense" because it was conviction for only conspiracy, not actually distributing or manufacturing the drug. Section 2K2.1(a)(4) of the Guidelines sets a base offense level of 20 for a defendant who violates 18 U.S.C. § 922(g) "subsequent to sustaining one felony conviction of … a controlled substance offense." "Controlled substance offense" is not defined in the Guideline itself, but the commentary to that guideline states that the phrase has the same meaning as it does in § 4B1.2(b) and Application Note 1 to § 4B1.1 (which includes conspiracy offenses). U.S.S.G. § 2K2.1 cmt. n.1. Adams argued that the commentary and application note impermissibly added to the definition of "controlled substance offense" and that the Sentencing Commission's interpretation of the definition was not entitled to deference.

The district court overruled Adams' objection. The court determined that Adams' advisory guideline range was 70 to 87 months, based on a total offense level of 23 and a criminal history category of IV. Adams was sentenced to 84 months in prison and three years of supervised release.

II.  *Analysis*

Adams raises two issues on appeal. The first is whether the state search warrant was supported by probable cause, and, if not, whether the police acted in good faith when they executed the warrant. The second is whether the district court properly calculated the advisory guideline range.

A.  *Probable Cause and Good Faith*

When reviewing a search warrant, we give "'great deference' to the issuing judge's determination so long as the judge had a 'substantial basis' for the finding." *United States v. Miller*, 673 F.3d 688, 692–93 (7th Cir. 2012), quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Here, that deference is given to the state-court judge who issued the search warrant. We give no deference to (i.e., review *de novo*) the district court's finding that there was a substantial basis for issuing the warrant. *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011). We also review *de novo* whether the good-faith exception applies to a search warrant later found to be invalid. *United States v. Mitten*, 592 F.3d 767, 770–71 (7th Cir. 2010).

Probable cause exists when the circumstances "indicate a reasonable probability that evidence of crime will be found in a particular location; neither an absolute certainty nor even a preponderance of the evidence is necessary." *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010); see generally *Gates*, 462 U.S. at 235. Where, as here, an affidavit is the only

evidence presented to a judge to support a search warrant,
"the validity of the warrant rests solely on the strength of the
affidavit." *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir.
2009). When an informant is the source of the information in
an affidavit, "the probable-cause determination turns on the
informant's credibility." *United States v. Hansmeier*, 867 F.3d
807, 811 (7th Cir. 2017), citing *Bell*, 585 F.3d at 1049. We con-
sider all relevant circumstances, including:

> first, the degree to which the informant ac-
> quired knowledge of the events through
> firsthand observation; second, the detail and
> specificity of the information provided by the
> informant; third, the interval between the date
> of the events and a police officer's application
> for the search warrant; and fourth, the extent to
> which law enforcement corroborated the in-
> formant's statements.

*Searcy*, 664 F.3d at 1122; see also *United States v. Glover*, 755
F.3d 811, 816 (7th Cir. 2014) (we consider "the level of detail,
the extent of firsthand observation, the degree of corrobora-
tion, the time between the events reported and the warrant
application, and whether the informant appeared or testified
before the magistrate."). We consider these factors as a whole,
and "no one factor necessarily dooms a search warrant."
*United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011).

The search warrant here was supported by probable cause.
The affidavit disclosed Brandon's name, explained her close
relationship with Adams and her connection to the house,
and explained that she had been in the house earlier that day.
Brandon provided the police with detailed, firsthand infor-
mation about the criminal activity in the house. She described

the handgun by both caliber and make, the color of the gun case, and the color of the safe that contained methamphetamine pipes and possibly methamphetamine and marijuana. Brandon had a key to the safe that she gave to the police. Her information was corroborated to some extent by the anonymous tips informing the police that drug activity was occurring in Adam' house. It was also corroborated by the fact that the police had discovered drugs and paraphernalia in Brandon's car during the traffic stop, the fact that Brandon and Adams were together when they were pulled over and arrested, and the fact that Adams had a prior methamphetamine-related conviction. The police applied for, received, and executed the search warrant on the day that Adams and Brandon were arrested and Brandon gave them all of the information, so the information was fresh.

Taking all of these factors into consideration, the affidavit here is stronger than the one that established probable cause in *United States v. Olson*, 408 F.3d 366 (7th Cir. 2005), where the police had received a tip four months earlier that the defendant sold marijuana from his house. The defendant's nephew had been arrested for robbery and aggravated battery. *Id.* at 369. During his post-arrest interview, the nephew told police that he had gone to the defendant's house to steal his marijuana. The nephew explained that that he had seen a pound of marijuana in the defendant's bedroom just two days earlier, that he had seen guns in the residence, and that the defendant had a felony conviction. The police then reviewed the defendant's criminal history, which included multiple arrests and convictions for drug offenses. The police included this information in an affidavit, received a search warrant, and found over a kilogram of marijuana and multiple guns in the defendant's house. *Id.* We rejected the defendant's

challenge to the issuing judge's probable cause determination, finding that the information the nephew provided was a "firsthand account" that was "of sufficient detail, describing large quantities of marijuana … as well as several guns in the residence … that he had observed only two days earlier." *Id.* at 370. We also noted that the nephew's "admission that he intended to steal drugs from the defendant constitutes a statement made against his penal interest, and as such carries with it a presumption of reliability." *Id.* at 371.

Each individual detail in the search warrant affidavit for Adams' house may not have been sufficient to establish probable cause by itself, but the details were mutually reinforcing. The affidavit showed a "substantial chance" that police could find drugs and/or a gun in the house. See *United States v. McDuffy*, 636 F.3d 361, 363–64 (7th Cir. 2011); *Illinois v. Gates*, 462 U.S. at 245 n.13 ("probable cause requires only a probability or substantial chance of criminal activity"). Though Adams' prior conviction may not have been decisive in establishing probable cause, it was "still relevant and entitled to some weight," as was the fact that the deputy had found drugs and paraphernalia in the car when Adams was arrested. See *McDuffy*, 636 F.3d at 364. The totality of the circumstances here gave the issuing judge a substantial basis for his probable cause determination.

Even if the search warrant had not been supported by probable cause, the deputies were entitled to rely on the warrant. It is now well settled that "suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause." *United States v. Watts*, 535 F.3d 650, 656–57 (7th Cir.

2008), citing *United States v. Leon*, 468 U.S. 897, 924 (1984). An officer's decision to obtain a warrant is prima facie evidence that the officer was acting in good faith. *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002); *United States v. Reed*, 744 F.3d 519, 522 (7th Cir. 2014). A defendant can rebut this presumption in several ways, including by showing that "the affidavit submitted in support of the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Olson*, 408 F.3d at 372, quoting *Leon*, 468 U.S. at 923.

"Overcoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination." *United States v. Lickers*, 928 F.3d 609, 619 (7th Cir. 2019). Adams cannot overcome the presumption here. The situation here does not come close to one in which a reasonable officer would disregard the judge's determination of probable cause and forgo executing the warrant. This warrant had substantial support from the results of the traffic stop, Adams' criminal history, the anonymous tips, and the detailed and fresh information from Brandon. Thus, even if the warrant had not been supported by probable cause, the evidence from the search would still not be suppressed since the deputies acted in good faith.

B. *Sentencing Guidelines*

Adams' second argument on appeal is that the district court erred in applying the advisory Sentencing Guidelines to his case. We review *de novo* claims of procedural errors in sentencing, including a district court's legal interpretation of the Guidelines, such as whether a prior conviction counts as a "controlled substance offense." *United States v. Tate*, 822 F.3d 370, 375 (7th Cir. 2016).

Adams pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Under the Sentencing Guidelines, a person convicted under § 922(g)(1) starts with a base offense level of 14. See U.S.S.G. § 2K2.1(a)(6). That level increases to 20 if the defendant has a prior conviction for a "controlled substance offense." See U.S.S.G. § 2K2.1(a)(4). The term "controlled substance offense" is not defined in § 2K2.1 itself, but its Application Note 1 states that "'controlled substance offense' has the meaning given that term in § 4B1.2(b) and Application Note 1 of the Commentary to § 4B1.2."

Section 4B1.2(b) provides in turn:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

And Application Note 1 to § 4B1.2 teaches that "controlled substance offense" includes "the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."

Adams argues that his Illinois methamphetamine *conspiracy* conviction is not a "controlled substance offense" because the text of the Guideline itself does not include drug conspiracies or other inchoate or attempted drug crimes, and Application Note 1 to § 4B1.2 impermissibly adds to that Guideline's definition of "controlled substance offense" by

including conspiracies and other inchoate drug offenses. Based on this asserted conflict between the Guideline and the application note, he argues that the application note is not entitled to deference. See generally *Stinson v. United States*, 508 U.S. 36, 43 (1993) (if commentaries such as application notes are inconsistent with a Guideline, the Guideline controls).

In response, the government argues that there is no conflict between Application Note 1 to § 4B1.2 and that Guideline's definition of "controlled substance offense." Alternatively, the government argues that, at the very least, there is no conflict between the undefined term "controlled substance offense" in § 2K2.1 and the referenced definition of the term in *that* Guideline's application note. The government contends that the application note to § 2K2.1 simply explains what is meant by "controlled substance offense" within the meaning of that Guideline.

Adams is arguing one side of a fairly new circuit split created by *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018). Winstead argued that he received ineffective assistance of counsel at trial and at sentencing and that his sentence as a career criminal was improper. The case did not concern the Guideline at issue here (§ 2K2.1) but § 4B1.2 itself. *Winstead* held that Application Note 1 to § 4B1.2 impermissibly expands the definition of "controlled substance offense" in § 4B1.2 to include inchoate offenses like conspiracy and attempt. 890 F.3d at 1090–92. The D.C. Circuit acknowledged that it was creating a circuit split on this issue. *Id.* at 1091, citing *United States v. Lange*, 862 F.3d 1290, 1294 (11th Cir. 2017); *United States v. Nieves-Borrero*, 856 F.3d 5, 9 (1st Cir. 2017); *United States v. Solomon*, 592 F. App'x 359, 361 (6th Cir. 2014); *United States v. Chavez*, 660 F.3d 1215, 1228 (10th Cir. 2011);

*United States v. Mendoza-Figueroa*, 65 F.3d 691 (8th Cir. 1995)
(en banc).

One could distinguish *Winstead* from this case on the
ground that the applicable Guideline here is § 2K2.1, not
§ 4B1.2 itself. Section 2K2.1(a)(4)(A) is drafted differently. The
Guideline itself refers only to "a controlled substance offense"
and leaves all definition for its respective application note. As
noted, Application Note 1 says that "controlled substance of-
fense" "has the meaning given that term in § 4B1.2(b) and ap-
plication Note 1 of the Commentary to § 4B1.2." This basis for
distinguishing *Winstead*, offered by the government here, may
be a reasonable reading of the different language in the two
Guidelines and their application notes because Application
Note 1 to § 2K2.1 does not conflict with the language of
§ 2K2.1(a)(4) itself.

On the other hand, that basis for distinguishing *Winstead*
would produce two different meanings for the phrase "con-
trolled substance offense" in two different Guidelines, a tex-
tual consequence that is at least awkward. For that reason, the
Sixth Circuit recently extended the reasoning of *Winstead* to
the issue we face here, in *United States v. Havis*, 927 F.3d 382,
386–87 (6th Cir. 2019) (en banc). In *Havis* the defendant
pleaded guilty to being a felon in possession of a firearm and
the district court set his base level at 20 pursuant to § 2K2.1.
*Id.* at 383–84. He had a prior conviction for a crime that could
have included only the *attempted* sale of cocaine. *Id.* at 384. At-
tempt crimes are treated like conspiracies in these guideline
provisions. Even though the Guideline at issue was § 2K2.1,
the Sixth Circuit focused primarily on the interplay between
§ 4B1.2 and its Application Note 1. See *id.* at 385–87. The court
concluded that Application Note 1 to § 4B1.2 impermissibly

added attempted crimes to the definition of "controlled substance offense" in § 4B1.2. *Id.* at 386–87. This conclusion, according to the court, meant that attempted crimes were just as impermissibly added to § 2K2.1. *Id.* In a footnote, the court wrote:

> The Government argues in the alternative that the real commentary at issue is Application Note 1 to § 2K2.1, which cross-references the definition of "controlled substance offense" in Application Note 1 to § 4B1.2. The Government never made that argument in the district court or before the initial panel on appeal and arguably has forfeited its right to do so now. At any rate, it makes no difference whether we begin with § 2K2.1 to determine the meaning of "controlled substance offense." The commentary to § 2K2.1 directs us to apply "the meaning given that term in § 4B1.2(b) and Application Note 1 of the Commentary to § 4B1.2." If anything, the Government's proposed definition—which would require us to defer to commentary *on* other commentary—would carry an even more tenuous connection to the guideline's text.

*Id.* at 386 n.3.

The Sentencing Commission has responded to *Winstead* by proposing an amendment to § 4B1.2 that would move the inchoate offense language from the application note to the text of the Guideline as a new subsection (c). See 83 Fed. Reg. 65400, 65412–15 (Dec. 20, 2018). The public comment period for this amendment closed on March 15, 2019. The Sentencing Commission currently lacks a quorum of voting members,

but this proposed amendment indicates that attempt and conspiracy crimes may be added to the text of the Guideline itself in the near future, resolving this circuit split, including the *Havis* extension of *Winstead* to § 2K2.1(a)(4).

The Commission's correction has not yet taken effect, though, so we need to decide the legal issue under the current Guidelines. We conclude that the issue is governed by our decision in *United States v. Raupp*, 677 F.3d 756 (7th Cir. 2012), where we rejected the textual arguments that the D.C. Circuit later found persuasive in *Winstead*. In *Raupp*, the defendant was convicted of being a felon in possession of a firearm. His guideline calculation used § 2K2.1(a)(2) because he had at least two other convictions for crimes of violence. One of those prior convictions was for conspiracy to commit robbery. Among several arguments, Raupp made the same textual points that prevailed later in *Winstead*, arguing that Application Note 1 to § 4B1.2 could not properly extend the Guideline to treat conspiracy to commit robbery as a crime of violence. We squarely rejected that argument, holding that the application note's inclusion of conspiracy did not conflict with the text of the Guideline itself. "There cannot be a conflict because the text of § 4B1.2(a) does not tell us, one or another, whether inchoate offense are included or excluded. The note says they are included." 677 F.3d at 759. We added: "Deciding how to handle conspiracy is a question about wise policy, not about textual conflict." *Id*. at 760.

Other portions of the *Raupp* opinion addressed the now-abandoned residual clause of the definition of crimes of violence in § 4B1.2 and have had a complicated history as we and the Supreme Court have struggled with vagueness challenges to the similar residual clause in the Armed Career Criminal

Act, held unconstitutional in *Johnson v. United States*, 135 S. Ct. 2551 (2015). In *United States v. Rollins*, 836 F.3d 737, 742–43 (7th Cir. 2016), we overruled *Raupp*'s reliance on the residual clause in the now-advisory § 4B1.2, but our reasoning in *Rollins* was based on our decision in *United States v. Hurlburt*, 835 F.3d 715 (7th Cir. 2016) (en banc), which was in turn overruled by the Supreme Court in *Beckles v. United States*, 137 S. Ct. 886 (2017), which held that the now-advisory Guidelines are not subject to vagueness challenges. The "controlled substance offense" definition at issue here does not involve any of the complications presented by the residual clauses in definitions of violent crimes. The *Raupp* analysis of this purely textual issue under § 2K2.1 and § 4B1.2 thus remains sound as applied to the Guidelines' definitions of controlled substance offenses. See also *D'Antoni v. United States*, 916 F.3d 658, 663–65 (7th Cir. 2019) (reviewing this history as applied to defendant sentenced as career offender under then-mandatory Guidelines, using conviction for conspiracy to kill government witness as prior crime of violence).

Following this surviving portion of *Raupp*, as applied to inchoate controlled substance offenses, we find no error in the district court's decision to treat Adams as a career offender under the Sentencing Guidelines.

The district court's judgment is AFFIRMED.